SEAN REIS (SBN 184044)
(sreis@edelson.com)
EDELSON MCGUIRE, LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Tel: (949) 459-2124
Fax: (949) 459-2123

JAY EDELSON (*Pro Hac Vice*)
(jedelson@edelson.com)
RYAN D. ANDREWS (*Pro Hac Vice*)
(randrews@edelson.com)
ARI J. SCHARG (*Pro Hac Vice*)
(ascharg@edelson.com)
EDELSON MCGUIRE, LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378

ATTORNEYS FOR PLAINTIFF

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| PETER DEACON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PANDORA MEDIA, INC., a Delaware corporation,<br><br>Defendant. | ) Case No. 4:11-CV-4674-SBA<br>)<br>) **PLAINTIFF'S OPPOSITION TO DEFENDANT**<br>) **PANDORA MEDIA, INC.'S MOTION TO**<br>) **DISMISS**<br>)<br>) Location: Courtroom 1, 4th Floor<br>) 1301 Clay Street<br>) Oakland, CA 94612-5212<br>) Hearing Date: March 20, 2012<br>) Time: 1:00 p.m.<br>)<br>) [Hon. Saundra B. Armstrong] |

# TABLE OF CONTENTS

**INTRODUCTION** ...................................................................................................1

**CORRECTIONS TO PANDORA'S STATEMENT OF "FACTS"**...........................1

**ARGUMENT** .......................................................................................................4

**I.** **Deacon's Complaint sets forth sufficient facts demonstrating Pandora's violations of the Michigan Video Rental Privacy Act, M.C.L. §§ 445.1711, *et seq*** ..............................................................5

    **A.** **Deacon pleads facts to plausibly show at this stage of the case that Pandora rents, lends, and/or sells sound recordings to customers**...................5

    **B.** **Federal copyright law neither preempts Michigan's VRPA nor compels the conclusion that Pandora's sound recordings are merely public performances** ..................................................8

    **C.** **Deacon expressly alleges that Pandora disclosed his full name, music-listening history, and other identifying information without his consent, and such allegations are sufficient to confer Article III standing** ..............................................................11

        **1.** **Pandora disclosed Deacon's Protected Information**...........................12

        **2.** **Deacon further alleges invasions of privacy sufficient to confer Article III standing** ..............................................14

    **D.** **Contrary to Pandora's assertions, Deacon never provided written consent for the disclosure of his full name and music-listening preferences**..............................................16

    **E.** **Though Michigan's VRPA does not require Deacon to allege that he suffered actual damages as a result of Pandora's unlawful disclosure, damages may be reasonably inferred from the Complaint**...........................17

**II.** **Pandora fails to state any basis for the dismissal of Deacon's claims under the Michigan Consumer Protection Act, M.C.L. §§ 445.903, *et seq.*** ..........................20

    **A.** **Nothing in federal law authorized Pandora's disclosure of Deacon's name, music-listening history, or other Protected Information** ...................20

    **B.** **The MCPA does not require Deacon to plead that he suffered actual damages**..............................................22

    **C.** **Deacon sufficiently pleads that a reasonable person would have relied on Pandora's representations that it would only share his name and other private information with other Pandora users who knew his email address and requested to view his station** ................................23

**CONCLUSION** ..................................................................................24

# TABLE OF AUTHORITIES

**United States Supreme Court Cases Cited**

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ...............................................................5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................5

*Conley v. Gibson*, 335 U.S. 41 (1957) ......................................................................5

*Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 254 (1992) ........................................6

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ......................................14, 15

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ........................................................14

*Perrin v. U.S.*, 444 U.S. 37, 42 (1979) .....................................................................6

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) .................................................8

*Warth v. Seldin*, 422 U.S. 490 (1975) ..................................................................14, 15

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ..........................................................14


**United States Court of Appeals Cases Cited**

*Arista Records LLC v. Launch Media, Inc.*, 578 F.3d 148 (2d Cir. 2009) ...................11

*Baker v. G. C. Services Corp.,* 677 F.2d 775, 780 (9th Cir. 1982) ............................18

*Bonneville Int'l Corp. v. Peters*, 347 F.3d 485 (3d Cir. 2003) ...............................11

*Cassirer v. Kingdom of Spain*, 580 F.3d 1048 (9th Cir. 2009) .................................4

*Doe v. Chao*, 306 F.3d 170 (4th Cir. 2002), *aff'd* 540 U.S. 614 (2004) .....................18

*Doe v. United States*, 58 F.3d 494 (9th Cir. 1995) ...............................................24 n.9

*Douglas v. United States Dist. Court for Cent. Dist. of California*,
     495 F.3d 1062 (9th Cir. 2007) ...........................................................................16

*Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003) .......................6

*Graczyk v. West Pub. Co.*, 660 F.3d 275 (7th Cir. 2011) ....................................15, 18

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ...................5

*Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209 (11th Cir. 2005) .....................18

*Klimas v. Comcast Cable Comms., Inc.*, 465 F.3d 271 (6th Cir. 2006).................15, 18

*Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134 (9th Cir. 2006)....................................9

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)........................................4, 7

*McDonald v. Sun Oil Co.*, 548 F.3d 774 (9th Cir. 2008)..........................................6

*Preminger v. Peake*, 552 F.3d 757 (9th Cir. 2008)................................................14

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009)............................6

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393 (9th Cir. 1986)..............24 n.9

*Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003).................................................9 n.4

*United States v. Am. Society of Composers, Authors, and Publishers*, 627 F.3d 64
    (2d Cir. 2010), *cert. denied*, No. 10-1337, 2011 WL 4536526 (U.S. Oct. 3, 2011)..........10

*Van Alstyne v. Elec. Scriptorium Ltd.*, 560 F.3d 199 (4th Cir. 2009)......................17, 18

**United States District Court Cases Cited**

*Allied Artists Pictures Corp. v. Rhodes*, 496 F. Supp. 408 (S.D. Ohio 1980) ..................9

*Arcilla v. Adidas Promotional Retail Operations, Inc.*,
    488 F. Supp. 2d 965 (C.D. Cal. 2007) ...............................................17

*Bobbitt v. Acad. Of Court Reporting, Inc.*, 252 F.R.D. 327 (E.D. Mich. 2008) ...........23

*Cedar Hill Assocs., Inc. v. Paget*,
    No. 04 C 0557, 2005 WL 3430562 (N.D. Ill. Dec. 9, 2005) .........................19

*Cohen v. Facebook, Inc.*, C 10-5282 RS, 2011 WL 3100565 (N.D. Cal. June 28, 2011).............18

*Doe 1 v. AOL LLC*, 719 F. Supp. 2d 1102 (N.D. Cal. 2010).......................13 n.7, 15, 19

*Echostar Satellite, L.L.C. v. Viewteh, Inc.*, 543 F. Supp. 2d 1201 (S.D. Cal. 2008) ..............9

*Gutierrez v. Barclays Group*,
    No. 10CV1012 DMS (BGS), 2011 WL 579238 (S.D. Cal. Feb. 9, 2011) .................18

*Hoang v. Reunion.com, Inc.*,
    No. C-08-3518, 2010 WL 1340535 (N.D. Cal. Mar. 31, 2010) ......................23

*Hotel Emps. And Rest. Emps. Local 2 v. Vista Inn Mgmt. Co.*,
    393 F. Supp. 2d 972 (N.D. Cal. 2005) ..............................................4

*In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705 (N.D. Cal. 2011)........................15

*Low v. LinkedIn*, No. 11-CV-01468-LHK, 2011 WL 5509848 (N.D. Cal. Nov. 11, 2011)..........13

Plaintiff's Response in Opposition                                    Case No. 4:11-CV-4674-SBA
To Defendant's Motion to Dismiss
iii

*No Doubt v. Activision Publ'g, Inc.*, 702 F. Supp. 2d 1139 (C.D. Cal. 2010) ...............................9

*Peters v. Cars to Go, Inc.*,
    No. 1:97-CV-920, 1999 WL 33502378 (W.D. Mich. Mar. 17, 1999)............................23

*Roling v. E\*Trade Sec., LLC*, 756 F. Supp. 2d 1179 (N.D. Cal. 2010) ........................................17

*Wong v. T-Mobile USA, Inc.*, No. 05-73822, 2006 WL 2042512 (E.D. Mich. 2006) .............20, 21

**State Court Cases Cited**

*Attorney General v. Diamond Mort. Co.*, 327 N.W.2d 805 (Mich. 1982)...................................21

*Baker v. Arbor Drugs, Inc.*, 544 N.W.2d 727 (Mich. Ct. App. 1996) ...........................................21

*Dix v. Am. Bankers Life Assurance Co.*, 415 N.W.2d 206 (Mich. 1987) ......................................23

*Head v. Phillips Camper Sales & Rental, Inc.*, 593 N.W.2d 595 (Mich. Ct. App. 1999) .............22

*Liss v. Lewiston-Richards, Inc.*, 732 N.W.2d 514 (Mich. 2007) ...................................................22

*Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28 (Mich. 1999) .........................................................20

*Van Eman v. Cars Prot. Plus*,
    No. 267473, 2007 WL 1491814 (Mich. Ct. App. May 22, 2007) ....................................22

*Zine v. Chrysler Corp.*, 600 N.W.2d 384 (Mich. Ct. App. 1999).............................................23, 24

**Federal Statutes Cited**

Cable Act, 47 U.S.C. § 551(f)....................................................................................................19 n.8

Copyright Act, 17 U.S.C. § 102(a) ...................................................................................................9

Copyright Act, 17 U.S.C. § 114(d)(4)(C) ......................................................................................10

Copyright Act, 17 U.S.C. § 301 .......................................................................................................9

Driver's Privacy Protection Act, 18 U.S.C. § 2724(b) .............................................................19 n.8

Fair Credit Reporting Act, 15 U.S.C. § 1681n.................................................................................17

Privacy Act, 5 U.S.C. § 552a(g)(4)..................................................................................................18

Stored Communications Act, 18 U.S.C. §§ 2701, *et seq* ...........................................................13, 18

Telephone Consumer Protection Act, 47 U.S.C. § 227(c)(5)(B)...............................................19 n.8

**Federal Rules Cited**

Fed. R. Civ. P. 8(a)(2) ...........................................................................5

Fed. R. Civ. P. 12(d) ...........................................................................8

**State Statutes Cited**

Michigan Consumer Protection Act, M.C.L. §§ 445.903, *et seq* ........................................... *passim*

Video Rental Privacy Act, M.C.L. §§ 445.1711-1715 ....................................... *passim*

**Legislative History Materials Cited**

H.B. No. 5331, 1988 Mich. Legis. Serv. 378 ...........................................7 n.1, 10, 14

S. Rep. No. 104-128 (1995) ...........................................................10

**Secondary Sources Cited**

Black's Law Dictionary (9th ed. 2009) ...........................................................6

Merriam-Webster.com, http://Merriam-webster.com/dictionary/ ...................................6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Defendant Pandora Media, Inc. ("Pandora") publicly discloses its users' names and music-listening histories—violating its own Privacy Policy, the Michigan Video Rental Privacy Act, M.C.L. §§ 445.1711, *et seq.* ("VRPA"), and the Michigan Consumer Protection Act, M.C.L §§ 445.903, *et. seq.* ("MCPA"), in the process.

Rather than compensate aggrieved Pandora users like Plaintiff Peter Deacon ("Deacon")—let alone take responsibility for its offensive conduct—Pandora seeks refuge behind a laundry list of supposed facts and legal arguments. Going well-beyond the actual allegations of the Complaint, Pandora rails against Deacon's claims by arguing that federal copyright law render it incapable of being considered a "seller," "renter," or "lender" of sound recordings as those terms are understood under the VRPA, that Deacon lacks standing, that Pandora obtained Deacon's written consent for the disclosure, and that Deacon fails to plead certain elements that Pandora claims (albeit incorrectly) are required for relief.

Fortunately for Deacon and the thousands of other Pandora customers whose private information was disclosed without their consent to their Facebook contacts and others generally searching the Internet, none of Pandora's myriad attacks have merit. Ultimately, Deacon's Complaint provides sufficient details to show that the Michigan VRPA and MCPA apply to Pandora, that Pandora violated both statutes, and that he and others are entitled to statutory damages.

Accordingly, and as explained further below, this Court should deny Pandora's Motion to Dismiss and allow the case to proceed to discovery.

**CORRECTIONS TO PANDORA'S STATEMENT OF "FACTS"**

In an effort to argue that it services evade the reach of the VRPA and MCPA, Pandora's Motion to Dismiss ignores the facts as pleaded in the Complaint and introduces a multitude of information well outside the pleadings to bolster its own fact-laden arguments. Worse yet, Pandora attempts to disguise its reliance on outside facts by making repeated citation to the

1    Complaint. To correct the distorted picture Pandora has attempted to create, what follows are the

2    actual facts pleaded in the Complaint.

3    ***Pandora's Music Distribution Services***

4            Pandora operates a "massive for-profit sound recording library" through its website,

5    www.Pandora.com. (Compl. ¶¶ [hereinafter "¶"] 2, 19). To use Pandora, consumers like Deacon

6    are required to provide Pandora with their full names and email addresses. Pandora then creates a

7    "Personal Page" for each user containing what the Complaint defines as "Protected Information,"

8    which includes "the person's full name, profile information, most recent '[Pandora] station,'

9    recent activity, listening history, bookmarked tracks, and bookmarked artists." (¶¶ 23, 43.) Prior

10   to August of 2010, Pandora's Privacy Policy stated that all such Personal Information would be

11   kept "confidential" and that Pandora would *only* disclose a user's music-listening histories to

12   other registered users who specifically knew the user's email address and requested the user's

13   station. (¶¶ 6, 24.) When registering with and using Pandora, Plaintiff Deacon reasonably

14   believed that his "Protected Information" would only be available to other registered Pandora

15   users who knew his email address and sought out his Pandora stations. (¶ 54.)

16           Users are able to build customizable music "stations" on Pandora by selecting a specific

17   song, artist or genre. (¶ 3.) Pandora then generates a "station" of "songs containing similar

18   musical attributes" to the preferences the users indicate in their station selections, "lends a

19   continuous stream of songs tailored to the individual's tastes," and allows users "to borrow

20   digital sound recordings for the duration of the song(s)." (¶¶ 2, 3.) Pandora catalogues its users'

21   past and present stations and stores them for an indefinite period of time on each user's

22   automatically created Profile Pages. (¶¶ 4, 23.)

23           When a user "listens to music through Pandora[.com], [Pandora] allows the user to

24   temporarily store a digital copy of the song currently playing on their computer." (¶ 20.) When

25   the song or songs are completed, "Pandora removes the track from the user's computer." (¶ 20.)

26   Pandora profits from this service through ads generated by third-party advertisements and links

27   to purchase the sound recordings it distributes. (¶ 2.)

28

***Pandora's Disclosure of Deacon and Other Users' Protected Information***

Contrary to the terms of the operative Privacy Policy, Pandora disclosed its users' Personal Pages to the public by permitting its website to be searchable via search engines such as Google. (¶¶ 6, 25, 45.) Thus, any person with access to the World Wide Web could view Pandora's users' Protected Information. (¶ 25.)

Additionally, in April of 2010, Pandora unilaterally and without warning, integrated its users' accounts with Facebook. (¶ 26.) As a result of this integration, Pandora users (including those who attempted to remain anonymous through the use of pseudonymous email addresses) found that their Personal Pages were exposed to all of their Facebook contacts—without being afforded an opportunity to approve or prevent such disclosures. (¶¶ 7, 27.) In other words, contrary to the terms of the Privacy Policy, Pandora disclosed its users' Protected Information, including their "listening histor[ies]" … "in conjunction with their real names," (¶ 27), to each of their "Facebook contacts … without consent." (¶ 28.)

Plaintiff Deacon is a Michigan resident who registered for a Pandora account in 2008 and subsequently had his Protected Information disclosed to the World Wide Web without his consent. (¶¶ 29, 30, 32.) Pandora also disclosed Deacon's Protected Information to his entire "Facebook network" through its integration, without first (or ever) obtaining his consent. (¶ 33.)

***Pandora's Outside "Facts"***

While the above facts are pleaded in the Complaint, Pandora introduces several supposed facts which this Court should not—especially without the benefit of discovery—accept as true. For example, Pandora goes well beyond the Complaint to assert that:

- "To comply with the statutory license for the webcast of digital music, Pandora users may influence, but not choose, what songs the service plays," (Def. Mot. 4:17-20);

- Pandora uses "proprietary algorithms" to select songs for its users (Def. Mot. 4:14-20);

- Pandora users can "publish 'likes' to others" (Def. Mot. 4:20-21);

- The copy of a song provided by Pandora to a user is "played *contemporaneously* with transmission" (Def. Mot. 8:9-10) (emphasis in original);

- "Pandora does not give its users the right to possess or use music, with or without payment" (Def. Mot. 9:3-4);

- "To create a seamless listening experience, streaming technology temporarily stores data in a limited inaccessible way *solely* to facilitate contemporaneous playback" (Def. Mot. 9:5-6);

- "Users may only listen to Pandora songs as the Pandora service plays them (Def. Mot. 9:10-11);

- "Users never 'return' [the sound recordings] … Rather, whatever packets of digital music Pandora send to and stores on the user's machine are deleted as soon as Pandora completed transmission of the song" (Def. Mot. 9:11-13);

- Pandora uses "cached or buffered packets merely to facilitate [its] contemporaneous playback using Internet streaming technology" (Def. Mot. 9:15-16);

- "All digital content transmitted over the Internet is at least temporarily cached on every computer in the network path" (Def. Mot. 9:18-19);

- "Internet radio services like Pandora [] pay statutory licensing fees to SoundExchange" (Def. Mot. 10:11-12); and

- "Pandora does not sell sound recordings" (Def. Mot. 12:15).

As none of these so-called "facts" are contained in the Complaint, this Court should refuse to consider them when deciding Pandora's Motion to Dismiss.

### ARGUMENT

In reviewing a motion to dismiss, the court "accept[s] all well-pleaded factual allegations in the complaint as true … and determine[s] whether the factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Cassirer v. Kingdom of Spain*, 580 F.3d 1048, 1052 n.2 (9th Cir. 2009) (internal citations and quotations omitted). "As a general rule, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (internal citations and quotations omitted). However, the court may take judicial notice of documents outside the complaint when the plaintiff "has relied upon [the] documents in framing the complaint." *Hotel Emps. and Rest. Emps. Local 2 v. Vista Inn Mgmt. Co.*, 393 F. Supp. 2d 972, 979-80 (N.D. Cal. 2005) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

Rule 8(a)(2) requires only that a pleading contain a short and plain statement of the claim showing that the pleader is entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 335 U.S. 41, 47 (1957)). Detailed factual allegations are not required. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555). Instead, "[t]o survive a motion to dismiss, a complaint need only contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570).

## I.     Deacon's Complaint sets forth sufficient facts demonstrating Pandora's violations of the Michigan Video Rental Privacy Act, M.C.L. §§ 445.1711, *et seq*.

To state a claim under the VRPA, Deacon must allege: (i) that Pandora "was engaged in the business of selling at retail, renting, or lending … sound recordings," (ii) that Pandora disclosed "a record or information concerning the purchase, lease, rental, or borrowing" of the sound recordings to "any person, other than the customer," and (iii) that the disclosure "indicat[ed] the identity of the customer." M.C.L. § 445.1712.

Pandora throws the kitchen sink at Deacon's VRPA claim. First, Pandora argues that it does not rent, lend, or sell sound recordings, and that federal copyright law prohibits a contrary conclusion. (Def. Mot. 8:2-11:22.) Rather, according to Pandora, it streams public performances of songs over the Internet, just as traditional radio stations do over the airwaves. Pandora further contends that Deacon lacks standing, (Def. Mot. 12:24-14:6), that the information disclosed did not reveal Deacon's identity, (Def. Mot. 14:7-22), that it obtained Deacon's written consent for the disclosure, (Def. Mot. 14:23-16:5), and that Deacon failed to alleged that he suffered actual damages, as supposedly required under the statute. (Def. Mot. 16:6-25.) As explained below, Pandora's arguments fall apart.

### A.     Deacon pleads facts to plausibly show at this stage of the case that Pandora rents, lends, and/or sells sound recordings to customers.

Going well beyond the pleadings, Pandora asserts that it merely "streams songs it chooses over the Internet," that its technology "temporarily stores data in a limited, inaccessible way *solely* to facilitate contemporaneous playback," and that "[u]sers may only listen to Pandora

1   songs as the Pandora service plays them." (Def. Mot. 9:4-13.) According to Pandora, these facts

2   preclude the conclusion that it plausibly sells, rents, or lends sound recordings as required by the

3   VRPA. (Def. Mot. 8:2-9:15, 19:21-22.) Such arguments cannot form the basis for dismissal.

4        Pandora "rents" or "lends" sound recordings as those terms are commonly understood.

5   While the VRPA defines "customer" to mean "a person who purchases, rents, or borrows a book

6   or other written material, or a sound recording, or a video recording," it does not define the terms

7   "selling," "renting," or "lending." *See* M.C.L. § 445.1711. As such, the Court must determine the

8   meaning of such terms. *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 796 (9th Cir. 2003).

9        The Court must start with the language of the statute itself and "determine whether the

10  language at issue has a plain meaning." *McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir.

11  2008). When the statutory language is unambiguous, "this first canon is also the last: judicial

12  inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992); *See Satterfield v.*

13  *Simon & Schuster, Inc.,* 569 F.3d 946, 951 (9th Cir. 2009) ("[O]ur inquiry begins with the

14  statutory text, and ends there as well if the text is unambiguous"). Unless otherwise defined by

15  the statute, "words will be interpreted as taking their ordinary, contemporary, common

16  meaning." *Perrin v. U.S.*, 444 U.S. 37, 42 (1979).

17       The terms "renting" and "lending," are words of widespread common usage that, along

18  with the related term "loan," have several generally accepted meanings that encompass

19  Pandora's manner of distributing music. Even Pandora recognizes that "lend" is defined as "to

20  put at another's temporary disposal" and "rent" is defined as "to grant the possession and

21  enjoyment of in exchange for rent." (Def. Mot. 8:26-9:3.) Black's Law Dictionary defines "rent"

22  as "[c]onsideration paid, usu. periodically, for the use or occupancy of property" and "loan" as

23  "[a]n act of lending; a grant of something for temporary use." Black's Law Dictionary (9th ed.

24  2009); *see also Merriam-Webster.com*, http://www.merriam-webster.com/dictionary/loan (last

25  visited December 30, 2011). Thus, the terms "renting" and "lending" are unambiguous and

26  should be given their ordinary and contemporary meanings.

27       Here, the Complaint sufficiently demonstrates that Pandora "rents" and/or "lends" sound

28

recordings as those terms are commonly understood. Deacon alleges that Pandora transmits a complete digital copy of the chosen song(s) to the user's computer from its library of music, (¶ 20), and that the user "borrow[s] [the] digital sound recordings for the duration of the song(s)." (¶¶ 2, 19.) Then, Pandora causes its digital copy to be removed from the user's computer. (¶ 20.) These allegations are sufficient to raise the plausible inference that the sound recordings are placed at the customers' "temporary disposal" so as to be considered lent by Pandora and borrowed by customers under the statute.[1] Additionally, Pandora users who pay a subscription fee provide "rent" to enjoy the use of Pandora's service.

In an effort to liken itself to traditional radio, Pandora pretends as though users do not actually "possess" or "use" the borrowed sound recordings, (Def. Mot. 9:3-4), and fills its analysis with unsubstantiated assertions that its renting and lending of sound recordings should be characterized as mere "webcasts [of] music performances" that are "played contemporaneously with transmission" which is "necessary for a seamless listening experience." (Def. Mot. 8:4-9:13.) Pandora further asserts that the copies it transmits are "temporarily store[d] … in a limited, inaccessible way … in cached or buffered packets," that its Terms of Use prohibit consumers from copying or storing the sound recordings it transmits, and that "user[s] may only listen to … songs as the … service plays them." (Def. Mot. 8:8-9:16.)

Pandora's motion is an inappropriate vehicle for such assertions. Discovery will reveal whether and to what extent Pandora's customers may make use of the sound recordings while at their disposal. *See Lee*, 250 F.3d at 688 ("[F]actual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6).") This is especially true where, as here, the defendant's unchallengeable facts are highly suspect. Pandora admits that it transmits actual digital copies of music, not merely signals over the airways or through satellite. (Def. Mot. 8:7-10:2.) Discovery may ultimately show that Pandora transmits full copies of songs, that the songs are not actually deleted from the customer's computers until the program is closed,

---

[1] Such definitions dovetail nicely with the statute's purpose—which is "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain [media]." H.B. No. 5331, 1988 Mich. Legis. Serv. 378.

that the songs are downloaded onto the customers' computers, and that customers can pause the recordings without missing any part of the song, skip songs while they are being played, convert the recordings to MP3s, permanently store the files, and otherwise make use of or enjoy the recordings at their temporary disposal.[2]

The simple truth is that at this stage of the case, Deacon has pleaded sufficient facts and is not required to prove his claim. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) ("[U]nder a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a *prima facie* case" on a motion to dismiss); *see also* Fed. R. Civ. P. 12(d) (when matters outside the pleadings are introduced on a motion to dismiss, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion").[3]

Accordingly, Pandora's argument that its service should not be considered the rental or lending of sound recordings is contrary to the allegations of the Complaint, premature, and incapable of providing grounds for dismissal at this time.

### B. Federal copyright law neither preempts Michigan's VRPA nor compels the conclusion that Pandora's sound recordings are merely public performances.

Recognizing that the plain meaning of "rent" and "lend" under the VRPA covers its method of music distribution, Pandora argues that federal copyright law mandates a finding that it merely broadcasts "public performances" as opposed to renting or lending songs. (Def. Mot.

---

[2]     That Pandora's Terms of Use prohibits the storage and copying of the recordings shows that Pandora is aware that its application makes such copying possible. Moreover, the point is irrelevant—virtually every video rental store and library has a policy prohibiting the copying of rented or borrowed materials. Prohibiting a renter of a video or DVD from copying the rented material does not alter the person's status as a "renter."

[3]     This Court should also decline Pandora's invitation to ignore Deacon's allegations that Pandora sells music. (Def. Mot. 12:1-23.) Deacon alleges that Pandora provides users with the ability to purchase songs, albeit from third parties, and that Pandora financially benefits from each sale. (¶ 21.) Though discovery may ultimately show Pandora receives no money from these sales (Pandora's brief is notably silent on the issue), dismissal of such claims at this stage is both unnecessary and improper.

1   2:17-3:12, 10:2-11:22.) Though it fails to mention the applicable legal doctrine by name,[4]

2   Pandora asks this Court to find that the Copyright Act preempts the VRPA to the extent the

3   VRPA classifies Pandora as a renter or lender of music files.[5] The problem for Pandora is that

4   the Copyright Act expressly carves out state privacy laws like the VRPA from its preemptive

5   force.

6          Section 301 of the Copyright Act addresses the statute's preemptive reach. 17 U.S.C.

7   § 301. "Congress, in drafting § 301, was free to include state laws dealing with non-equivalent

8   rights among those laws it chose to preempt, and Congress elected not to do so … leav[ing] the

9   states free to propound law in the areas of the common law rights of privacy. . . ." *Allied Artists*

10  *Pictures Corp. v. Rhodes*, 496 F. Supp. 408, 444, (S.D. Ohio 1980); *see also No Doubt v.*

11  *Activision Publ'g, Inc.,* 702 F. Supp. 2d 1139, 1142-43 (C.D. Cal. 2010). Pandora must satisfy

12  two conditions for the Court to find the VRPA preempted by the Copyright Act: (1) the subject

13  matter of the state law claim must fall within the subject matter of copyright, and (2) the rights

14  asserted under the stated law must be equivalent to the exclusive rights of copyright holders.

15  *Echostar Satellite, L.L.C. v. Viewtech, Inc.*, 543 F. Supp. 2d 1201, 1209 (S.D. Cal. 2008)

16  (quoting *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137-38 (9th Cir. 2006)). The Court

17  need not move past the first element—although neither is met—to conclude that the Copyright

18  Act does not preempt Plaintiff's VRPA claim.

19         Although "the presence of the copyrighted programming is central to understanding the

20  factual background of this case," Deacon "is not pursuing copyright claims." *Echostar Satellite*,

21  543 F. Supp. 2d at 1209. The irrelevancy of copyright law to this action is highlighted by the

22  wholly distinct subject matter of the VRPA and the Copyright Act. Section 102 of the Copyright

23

24  ─────────────────
    [4]      The preemption doctrine provides that, "federal law can preempt and displace state law

25  through: (1) express preemption; (2) field preemption (sometimes referred to as complete
    preemption); and (3) conflict preemption." *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003).

26  Pandora fails to mention, let alone analyze, any of the three types of preemption.

27  [5]      Any claim by Pandora that it is not making a preemption argument when it claims federal
    law "bars" application of the VRPA is belied by the cases cited in footnote 18 of its brief which

28  lifts the mask off its disguised argument.

─────────────────

1  Act sets forth the "subject matter of copyright" plausibly at issue here as the protection of

2  "original works of authorship" in sound recordings. 17 U.S.C. § 102(a); *Laws*, 448 F.3d at 1138-

3  39. Plaintiff's VRPA claim, however, has nothing to do with the protection of the copyrighted

4  songs Pandora transmits—the violation involves the invasion of privacy caused by the public

5  disclosure of Deacon's and other customers' listening histories of those works. H.B. No. 5331,

6  1988 Mich. Legis. Serv. 378; M.C.L. § 445.1712. As such, the subject matter of the VRPA

7  cannot be said to "fall[] within the subject matter of copyright." *Laws*, 448 F.3d at 1137.

8       Nevertheless, Pandora insists that "Federal copyright law draws a bright line between

9  public performances of sound recordings … and renting, lending, or selling sound recordings …

10  [such that] a public performance cannot also be a rental or loan." (Def. Mot. 10:3-4.) This

11  argument also fails—the Copyright Act expressly provides that the rights implicated by the

12  public performance of a sound recording by a digital audio transmission operate *independently* of

13  the rights associated with the lending, renting, or selling of sound recordings. 17 U.S.C.

14  § 114(d)(4)(C). As the Senate Report to the Digital Performance Right in Sound Recordings Act

15  explains:

16  > [W]here a digital audio transmission is a digital phonorecord delivery as well as a
17  > public performance of a sound recording, the fact that the public performance
   > may be exempt from liability … or subject to a statutory licensing … does not in
18  > anyway limit or impair the sound recording copyright owner's rights [concerning
   > sale, rental, or lending] under section 106(3) … [or] where an interactive digital
19  > audio transmission constitutes a distribution of a phonorecord as well as a public
   > performance of the sound recording, the fact that the transmitting entity has
20  > obtained a license to perform the sound recording does not in any way limit or
   > affect the entity's obligation to obtain a license to distribute phonorecords of the
21  > sound recording.

22  S. Rep. 104-128, at 27 (Aug. 4, 1995). Hence, Congress accounted for instances where a music

23  distributor's public performance may also constitute lending or renting under the Copyright Act.

24       Pandora gains nothing from the legal authorities it offers to distinguish between

25  streaming activities and the renting or lending of sound recordings. (Def. Mot. 10:3-11:22.) Not

26  only did the court in *United States v. Am. Society of Composers, Authors, & Publishers*, 627 F.3d

27  64, 74 (2d Cir. 2010) face a licensing fee issue not at all relevant here, it also analyzed a

28  "streaming" technology that apparently functions very differently from Pandora's application

and interface. *Id.* Moreover, Pandora completely ignores the *American Society* court's express

warning that its holding "does not foreclose the possibility, under circumstances not presented in

[the case before it], that a transmission could constitute both a stream and a download, each of

which implicates a different right of the copyright holder." 627 F.3d at 74 n.10.

The remaining authorities that Pandora relies on likewise offer it little support. The lone

footnote that Pandora cites from *Bonneville Int'l Corp. v. Peters*, 347 F.3d 485 (3d Cir. 2003)

does not state that streaming activities are always mutually exclusive of lending or renting music.

*Id.* at 489 n.8. *Arista Records* is similarly inapposite. There, the court considered whether an

Internet radio website, Launch Media, was "interactive" as required for statutory licensing.

*Arista Records LLC v. Launch Media, Inc.*, 578 F.3d 148, 150-51 (2d Cir. 2009). This issue is

irrelevant—the Copyright Act has no bearing on the Court's analysis of Deacon's VRPA claim

and, in any event, the copyright issue in *Arista* was decided after the factual record was fully

developed (rather than at the pleadings stage).

Ultimately, Pandora asks this Court to accept, without the benefit of a single page of

discovery and without any preemption analysis, that federal Copyright law prohibits a finding

that it rents or lends songs to customers. Federal copyright law—like Pandora's other

authorities—compels no such result. Rather, Congress expressly recognized that streaming

technology may also be considered distribution. Accordingly, this Court should reject Pandora's

thinly veiled preemption arguments.

### C. Deacon expressly alleges that Pandora disclosed his full name, music-listening history, and other identifying information without his consent, and such allegations are sufficient to confer Article III standing.

Ignoring the plain language of the Complaint, Pandora argues that Deacon lacks a

traceable injury necessary for standing because "[t]he complaint does not allege what 'Protected

Information'" Pandora disclosed and "does not plead that Pandora actually disclosed any of

1  [Deacon's] information to anyone else."[6] (Def. Mot. 13:10-18.) Likewise, Pandora asserts that

2  none of the information allegedly disclosed "indicate[d] the identity of the consumer" as required

3  by the VRPA. (*Id.* at 14:7-8.) These assertions are patently false. Deacon plainly alleges that

4  Pandora disclosed his full name, music-listening history, and other private information to his

5  Facebook contacts and others searching the Internet—violating his statutory rights and invading

6  his privacy in the process.

7  **1.    Pandora disclosed Deacon's Protected Information.**

8       The Complaint specifically defines "Protected Information" as information gathered by

9  Pandora for each user of its services and that it consists of "**the person's full name, profile**

10 **information, most recent 'station,' recent activity, listening history, bookmarked tracks,**

11 **and bookmarked artists."** (¶¶ 23, 43) (emphasis added.) "Pandora disclosed Deacon's

12 Protected Information to the public through its website" and "on or about April 21, 2010,

13 Pandora integrated its services with Facebook and made Deacon's Protected information

14 available to his Facebook network," as well as "users of social network aggregation services, and

15 Google search users." (¶¶ 32-33, 45.) While Deacon's allegation that Pandora disclosed his full

16 name in connection with his music-listening history standing alone satisfies the VRPA's

17 requirement that the disclosure "indicate the identity of the consumer," the Complaint goes even

18 further, alleging that, "[b]y automatically associating a person's real name listed on Facebook

19 with that person's Pandora account, users who attempted to remain anonymous by using

20 pseudonymous e-mail addresses and/or usernames had all of their listening history exposed in

21 conjunction with their real names." (¶ 27.)

22      Pandora argues that Deacon claims that it merely "made available" his Protected

23 Information, as supposedly distinguishable from actually "disclosing" that information. (Def.

24 Mot. 14:1-6.) That is not true for at least two reasons. First, Pandora ignores that Deacon alleges

25

26 ───────────────

[6]      Pandora repeatedly paraphrases the VRPA when it describes the disclosure of "records."

27 The scope of the VRPA is not so limited—it broadly prohibits disclosure of *any* information, not

28 merely records, concerning a consumer's purchase, rental, or borrowing of sound recordings and
other media. *See* M.C.L. § 445.1712.

1   that "Pandora [did not] receive consent to disclose its users' Protected information to their

2   Facebook contacts" and that when Pandora eventually notified its users that their Protected

3   information was publically available, "*their protected information had already been disclosed to*

4   *their Facebook contacts and the public at-large.*" (¶¶ 27, 28, 45) (emphasis added.) The

5   Complaint further details what information was "disclosed" and to whom. (¶¶ 43-46.) Deacon is

6   not required to identify each and every one of his Facebook contacts in the Complaint to satisfy

7   Rule 8's pleading standard.

8       Second, Pandora's distinction is one without a difference. It defies both the plain

9   language of the VRPA and common sense for a defendant to avoid liability where it discloses

10  information to the general public, as opposed to an identifiable group of individuals. Otherwise,

11  a video rental store could publish the rental history of any customer, post it on a large sign

12  hanging on the storefront window for all the world to see, and then skirt VRPA liability by

13  claiming that the disclosure was merely "made available" to no one in particular.

14      Pandora's reliance on *Low v. LinkedIn*, No. 11-CV-01468-LHK, 2011 WL 5509848

15  (N.D. Cal. Nov. 11, 2011) is thus misplaced.[7] The plaintiff in *Low* brought a claim under the

16  Stored Communications Act, 18 U.S.C. §§ 2701, *et seq*. ("SCA"), and various state law claims

17  arising from LinkedIn's alleged disclosure of users' "personally identifiable browsing histories"

18  to various third-party advertisers. 2011 WL 5509848, at *1. The plaintiff, however, "was unable

19  to articulate a theory of what information had actually been transmitted to third parties, how it

20  had been transferred to third parties, and how [the defendant] had actually caused him harm." *Id.*

21  at *3. Moreover, Low failed to allege any facts "that his browsing history, with embarrassing

22  details of his personal browsing patterns, was actually linked to his identity by [Defendant] and

23  actually transmitted." *Id.* at *3.

24

25  [7]     A more analogous case, which Pandora ignores, is *Doe 1 v. AOL LLC*, 719 F. Supp. 2d
    1102 (N.D. Cal. 2010), where this Court found that the plaintiff satisfied Article III's injury
26  requirement by alleging that AOL posted a database on the Internet that contained its members'
    highly personal information which could "reveal the identity of the AOL member." *Id.* at 1105.
27  Though Deacon's music-listening history is not as inherently sensitive as some of the highly
    personal information disclosed in *Doe 1*, it is entitled to statutory protection by the VRPA, and
28  therefore should be treated similarly.

In contrast to *Low*, Deacon has alleged that his Protected Information was disclosed to the public at large and to his Facebook contacts, (¶¶ 6-7, 25-26, 32-33, 44-45), that the information was disclosed because Pandora made such information public, (¶¶ 6, 25, 32, 44-45), that the information was further disclosed through Pandora's Facebook integration, (¶¶ 7, 26, 27, 33,44-45), and that the disclosure harmed him by violating his statutorily protected privacy rights conferred by the VRPA. (¶¶ 8, 28, 34, 46.) Accordingly, Deacon has "sufficiently alleged a particularized harm as a result of Defendant's conduct." *Low*, 2011 WL 5509848, at *3.

As a result, and despite Pandora's assertions to the contrary, Deacon has alleged that Pandora disclosed his "Protected Information" and that the information identified him personally to both his Facebook contacts and persons searching the Internet. Thus, Deacon has standing to sue under the VRPA.

### 2. Deacon further alleges invasions of his privacy sufficient to confer Article III standing.

To satisfy Article III, "the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue," *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990), by "demonstrat[ing] that [he] has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007). "The injury may be minimal." *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008).

Where a statute establishes a legal right, the violation of that right constitutes an injury-in-fact sufficient to confer standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) ("As we have previously recognized, '[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing'") (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)); *see also Massachusetts*, 549 at 516 ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before"). The "standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422

U.S. at 500. It is beyond dispute that the VRPA was enacted "to preserve personal privacy with respect to the purchase, rental or borrowing of certain materials; and to provide penalties and remedies for violation [the] act." H.B. No. 5331, 1988 Mich. Legis. Serv. 378.

Plaintiff Deacon alleges that his music-listening history was disclosed by Pandora to his Facebook contacts and others on the Internet in a manner that identified him personally, in violation of the VRPA. (¶¶ 23-27, 32-34, 43-45.) These allegations alone confer standing.

Courts routinely hold that violations of consumer privacy statutes containing private rights of action are sufficient to confer standing. *See, e.g., Graczyk v. West Pub. Co.*, 660 F.3d 275, 278 (7th Cir. 2011) (finding no monetary harm necessary to state a claim under the Driver's Privacy Protection Act, as "Congress has defined the relevant injury under the DPPA as the 'obtain[ment], disclos[ure], or [use]'") (citation omitted); *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 712 (N.D. Cal. 2011) (finding standing under the Wiretap Act based solely on violation of statute); *Klimas v. Comcast Cable Comms., Inc.*, 465 F.3d 271, 275-76 (6th Cir. 2006) (finding standing where plaintiff alleged violations of the Cable Act's privacy provisions, with no claim of economic harm); *Doe 1*, 719 F. Supp. 2d at 1109-12 (finding standing to seek injunctive relief under the Electronic Communications Privacy Act to prevent further disclosure of "highly sensitive personal information"); *see also Havens,* 455 U.S. at 373-74 (finding standing where plaintiffs alleged they were given false information regarding housing availability in violation of the Fair Housing Act, despite plaintiffs admitting they had no intent to purchase or rent the properties).

By disclosing Deacon's Protected Information without his consent, Pandora violated Deacon's legally protected privacy rights and caused him to suffer injury in fact. Because Deacon alleges that his music-listening history was disclosed in violation of the VRPA, and the VRPA "properly can be understood as granting persons in the plaintiff's position a right to judicial relief," *Warth*, 422 U.S. at 500, Deacon has standing under Article III and Pandora's motion on this issue should be denied.

**D.    Contrary to Pandora's assertions, Deacon never provided written consent for the disclosure of his full name and music-listening preferences.**

Pandora claims that Deacon provided written consent to disclose his music-listening history when he agreed to its Privacy Policy. (Def. Mot. 14:23-16:5.) This assertion has no merit. Put simply, Pandora produces no documentation showing that Deacon or any other customer consented to Pandora revealing their full names and music-listening histories.

Pandora certainly cannot rely on its Privacy Policy as it existed when Deacon started using Pandora, which expressly states:

> We offer Site-wide community features designed to help other registered users and subscribers find music they like, *by making available a registered user's or subscriber's station either in an anonymous form or to registered users or subscribers who know your email address and specifically request your station by entering your email address in the applicable field on our Site.*

(Def. Mot. 15:12-17.) (emphasis added.) Accordingly, far from obtaining Deacon's blanket consent to freely share his name and music-listening history, Pandora explicitly represented that it would keep his information private, only to be disclosed to other registered users who specifically knew his e-mail address and requested his station.

Even Pandora does not believe it actually had prior consent to disclose Deacon's or anyone else's music-listening histories on Facebook or the Web. Pandora recognized that disclosing its users' information violated its own Privacy Policy, and only updated its Privacy Policy *after* it integrated with Facebook so as to advise *new* customers (rather than existing customers like Deacon) that their information would be disclosed unless they took action:

> Unless you make your Profile Page private, information on that page is visible to other listeners and to the public. You may post favorite songs, bookmarks, stations or other biographical information on your Profile Page. When you are making the decision to be public or private, please keep in mind that as a result of our partnerships, including, Facebook's Instant Personalization, some of the people who may be looking at your profile or your Pandora activities may be your Pandora friends, or your friends on other social networks, including Facebook.

(Sterry Dec., Dkt. 20-1, Ex. O at 4.) Nothing in this language even purports to make its effect retroactive so as to plausibly constitute consent from Deacon and others who signed up for Pandora's services prior to the Facebook integration. Furthermore, Pandora failed to provide any notice of the changes to the Privacy Policy, making the changes inapplicable to Deacon on a go-

forward basis. *See Douglas v. United States Dist. Court for Cent. Dist. of California*, 495 F.3d 1062, 1066 (9th Cir. 2007) ("Parties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side"); *see also Roling v. E*Trade Sec., LLC*, 756 F. Supp. 2d 1179, 1191 (N.D. Cal. 2010) ("[A] contractual provision that allows a party to unilaterally change the terms of the contract without notice is unenforceable.") Accordingly, Pandora never received written consent from Deacon or any other customer, and Pandora's arguments premised on the receipt of such consent should be rejected.

> **E.** **Though Michigan's VRPA does not require Deacon to allege that he suffered actual damages as a result of Pandora's unlawful disclosure, damages may be reasonably inferred from the Complaint.**

Pandora's final attack against Deacon's VRPA claim is that the statute supposedly requires allegations showing "actual damages." (Def. Mot. 16:6-25.) This argument misreads the plain language of the VRPA, which provides in relevant part that:

> a person who violates this act shall be liable in a civil action for damages to the customer identified in a record or other information that is disclosed in violation of this act. The customer may bring a civil action against the person and may recover both of the following:
>
> (a) Actual damages, including damages for emotional distress, **or** $5,000.00, whichever is greater.
>
> (b) Costs and reasonable attorney fees.

M.C.L. § 445.1715 (emphasis added.) Based on the plain language of the statute, "the only conceivable interpretation is that a consumer whose rights have been violated may elect either actual or statutory damages, with no requirement of having to present evidence of actual harm." *See e.g. Arcilla v. Adidas Promotional Retail Operations, Inc.*, 488 F. Supp. 2d 965, 973-74 (C.D. Cal. 2007) (construing similarly worded private right of action under the Fair Credit Reporting Act, 15 U.S.C. § 1681n.)

Even the authority relied on by Pandora recognizes that where a statute like the VRPA contains a private right of action and provides for the greater of actual or statutory damages, no showing of economic harm is necessary to recover statutory damages. The court in *Van Alstyne v. Elec. Scriptorium Ltd.*, 560 F.3d 199 (4th Cir. 2009) emphasized that when the legislature wants to allow individuals the right to recover statutory damages absent proof of actual damages,

it can use "unambiguous" language such as, "the [defendant] shall be liable to the individual in an amount equal to the sum of whichever is greater: actual damages sustained by the individual as a result of the [conduct], or $1000." 560 F.3d at 205 (quoting *Doe v. Chao*, 306 F.3d 170, 178 (4th Cir. 2002), *aff'd* 540 U.S. 614, 627 (2004); *See Baker v. G. C. Services Corp.*, 677 F.2d 775, 780 (9th Cir. 1982) (It is well established in the Ninth Circuit that, where a statute provides for statutory damages, a plaintiff may recover "merely on proof of a violation; no proof of actual damages is required"). The drafters of the VRPA plainly chose to use such "unambiguous" language.

Pandora's reliance on *Cohen v. Facebook, Inc.*, C 10-5282 RS, 2011 WL 3100565 (N.D. Cal. June 28, 2011) is even more misplaced. The plaintiffs in *Cohen* sought relief for alleged misappropriation of their names or likenesses without demonstrating actual harm. *Id.* at *5-*6. Unlike the VRPA, however, "[r]esulting injury is the *sine qua non* of a cause of action for misappropriation of name," and "statutory minimum[s]" were provided for in instances where victims suffered from mental harm but incurred no commercial loss. *Id.* at *5. The instant case does not deal with a misappropriation of name claim and no such showing of injury is required.

Pandora's last ditch attempt to analogize the language of the VRPA's private right of action provision to those found in the SCA, 18 U.S.C. § 2707(b), or the Privacy Act, 5 U.S.C. § 552a(g)(4) is a nonstarter. Unlike the VRPA, the enforcement provisions of both the SCA and Privacy Act require a showing of "actual damages." *See* 18 U.S.C. § 2707(a); 5 U.S.C. § 552a(g)(4); *Van Alstyne*, 560 F.3d at 205-06. Even more disingenuous is Pandora's claim that privacy statutes are routinely construed as requiring proof of actual damages. (Def. Mot. 16:16.) The opposite is true—privacy statutes commonly confer a right to relief for victims of a statutory violation with no requirement of actual damages. *See, e.g., Klimas.*, 465 F.3d at 275-76 (Cable Act's private right of action allows suit for improper collection of internet browsing histories absent proof of actual damages); *Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209, 1216 (11th Cir. 2005) (stating that the Driver's Privacy Protection Act "does not require actual damages as a condition precedent to awarding liquidated damages"); *Graczyk*, 660 F.3d at 278

1   (same); *Gutierrez v. Barclays Group*, No. 10-CV-1012 DMS, 2011 WL 579238, at *5 (S.D. Cal.

2   Feb. 9, 2011) (Telephone Consumer Protection Act's ("TCPA") private right of action does not

3   require economic harm); *Doe 1*, 719 F. Supp. 2d at 1109-12 (ECPA confers right to sue to

4   prevent further disclosure of highly sensitive personal internet search information); *Cedar Hill*

5   *Assocs., Inc. v. Paget*, No. 04 C 0557, 2005 WL 3430562, at *3 (N.D. Ill. Dec. 9, 2005) ("[F]rom

6   a plain reading of the statute, it appears clear that actual damages are not required to recover

7   under the ECPA, as long as a defendant" violated the statute).[8]

8        Furthermore, damages, which under the VRPA can include emotional distress, can

9   readily be inferred from the Complaint. Pandora made Deacon's private information public

10  without his consent, in violation of both his statutory rights as well as his expectations under

11  Pandora's Privacy Policy. (¶¶ 52-54.) Discovery will reveal the extent such conduct caused him

12  damages.

13       Thus, in light of the actual language of the VRPA and its similarity to other statutes for

14  which no showing of actual damages is necessary, coupled with the reasonable inferences drawn

15  from the Complaint, this Court should read the VRPA's private right of action to effectuate its

16  purpose—providing relief to individuals when their statutory privacy rights are violated. As

17  such, this Court should reject Pandora's arguments based on actual damages.

18       Ultimately, none of Pandora's attacks on Deacon's VRPA claim militate in favor of

19  dismissal at this stage of the proceedings. Consequently, this Court should deny Pandora's

20  Motion to Dismiss.

21

22

23  [8]    *Compare* M.C.L. § 445.1715's language *and* the Cable Act, 47 U.S.C. § 551(f) ("(1) Any
    person aggrieved by any act of a cable operator in violation of this section may bring a civil
24  action in a United States district court. (2) the court may award— (A) *actual damages but not
    less than liquidated damages* computed at the rate of $100 a day for each day of violation or
25  $1,000, whichever is higher) (emphasis added); *and* the Driver's Privacy Protection Act, 18
    U.S.C. § 2724(b) ("The court may award—(1) *actual damages, but not less than liquidated
26  damages* in the amount of $2,500") (emphasis added); *and* the TCPA, 47 U.S.C. § 227(c)(5)(B)
    (Individual who receives prohibited phone call may bring "an action to recover for actual
27  monetary loss from such a violation, or to receive up to $500 in damages for each such violation,
28  whichever is greater.")

Plaintiff's Response in Opposition                          Case No. 4:11-CV-4674-SBA
To Defendant's Motion to Dismiss

19

**II.     Pandora fails to state any basis for the dismissal of Deacon's claims under the Michigan Consumer Protection Act, M.C.L. §§ 445.903, *et seq*.**

The MCPA prohibits "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," M.C.L. § 445.903(1). Prohibited practices include:

- "Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." M.C.L § 445.903(1)(cc);

- "Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." M.C.L § 445.903(1)(s); and

- "Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is." M.C.L § 445.903(1)(bb).

Deacon alleges that Pandora violated these provisions of the MCPA when, as discussed above, it breached its own Privacy Policy and disclosed his Protected Information to the public—including to his Facebook contact and others on the Internet—without his consent. (¶¶ 52-54.)

Unsatisfied, Pandora rails against Deacon's MCPA claim on three grounds: (1) Pandora is a federally regulated business, and therefore is exempt from liability under the MCPA, (2) Deacon has failed to plead reliance on Pandora's Privacy Policy when he first signed up for Pandora's service, and (3) the Complaint fails to allege that Deacon suffered actual damages. All three arguments fail. (Def. Mot. 17:1-19:17.)

**A.     Nothing in federal law authorized Pandora's disclosure of Deacon's name, music-listening history, or other Protected Information.**

The MCPA exempts "[a] transaction or conduct *specifically authorized* under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." M.C.L. § 445.904(1)(a) (emphasis added.) Relying on this exemption, Pandora argues that the music streaming industry is exempt from regulation by the MCPA because music streaming is "authorized by [the DPRA] and regulated by the Copyright Office." (Def. Mot. 17:26-18:4.)

Pandora's syllogism is false. "Even if a defendant is licensed or regulated, it may remain liable under the MCPA for conduct outside the scope of its license or the pertinent regulations."

*Wong v. T-Mobile USA, Inc.*, No. 05-73922, 2006 WL 2042512, at *7 (E.D. Mich. 2006). To determine whether the exemption applies, the Court must first identify the general transaction or conduct at issue, and then determine whether it is "specifically authorized" by laws administered by a regulatory agency. *Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28, 37-38 (Mich. 1999). "The burden of proving an exemption from [the MCPA] is upon the person claiming the exemption." M.C.L. § 445.904(4). Pandora has not come close to meeting its burden.

The Michigan Supreme Court's opinion in *Attorney General v. Diamond Mortgage Co.* is particularly instructive regarding the scope of this exemption. In *Diamond Mortgage*, the defendant was a licensed real estate broker sued for conduct related to "mortgage writing"— conduct that was not "specifically authorized" under the defendant's real estate broker's license. 327 N.W.2d 805, 811 (Mich. 1982). As such, "while the [real estate broker's] license generally authorizes [defendant] to engage in the activities of a real estate broker, it does not *specifically authorize* the conduct that plaintiff alleges is violative of the [MCPA]…." *Id.* at 811 (emphasis added); *see also Baker v. Arbor Drugs, Inc.*, 544 N.W.2d 727, 732 (Mich. Ct. App. 1996) (finding exemption did not apply to defendant pharmacist's fraudulent advertising because "the alleged violative conduct [fell] outside the realm of the regulatory commission"); *see also Wong*, 2006 WL 2042512, at *9 (finding that the exemption did not apply to an MCPA claim based upon the defendant wireless telephone company's double-billing practices because the Federal Communication Act only regulates cellular telephone service rates, and thus, the alleged conduct fell outside its purview).

Put simply, Deacon's MCPA claim falls well outside the reach of the DPRA and Copyright Office. This is because Deacon's MCPA claim is based entirely on Pandora's unlawful disclosure of his music-listening history to his Facebook contacts and others on the Internet, in plain violation of both the VRPA and Pandora's own Privacy Policy. Pandora has not (and cannot) present any evidence to show that its disclosure of information related Plaintiff's music-listening history was "specifically authorized" by the DPRA or the Copyright Office. Instead, and without citing to any specific provision, Pandora refers generally to a regulation

1   entitled "Notice and Recordkeeping Requirements for Statutory Licenses, 37 C.F.R. § 270.1, *et*

2   *seq.*" (Def. Mot. 17:27-18:1), yet fails to provide any explanation as to how this regulation

3   governs the disclosure of Plaintiff's music-listening history (it plainly does not). Thus, Pandora

4   has not shown that it is exempt from MCPA liability. M.C.L. § 445.904(4).

5          Pandora's attempt to buttress its argument with *Liss v. Lewiston-Richards, Inc.* falls short.

6   *Liss* involved an MCPA claim against a builder that failed to build a residential home in a

7   workmanlike manner. 732 N.W.2d 514, 520-21 (Mich. 2007). The Court found that the

8   defendant builder was exempted from the MCPA because the conduct at issue—building a

9   home—was specifically authorized by statute and regulated by the Residential Builders' and

10  Maintenance and Alteration Contractors' Board. *Id.* at 520. The *Liss* case is readily

11  distinguishable, as the conduct at issue here—the disclosing of information related to Plaintiff's

12  music-listening history—is not specifically authorized by statute or regulated by a government

13  agency. Thus, Pandora's first argument does not support dismissal.

14          **B.     The MCPA does not require Deacon to plead that he suffered actual**
               **damages.**

15

16          Tacitly acknowledging that its conduct is not exempt under the MCPA, Pandora cherry

17  picks language from the statute to argue that the claim is deficient because, supposedly, Deacon

18  does not allege that he incurred actual damages. (Def. Mot. 18:6-7.) This argument fails

19  principally because actual damages are not required to state a claim under the MCPA. M.C.L.

20  § 445.911(1)(b); *Head v. Phillips Camper Sales & Rental, Inc.*, 593 N.W.2d 595, 603 (Mich. Ct.

21  App. 1999); *See Van Eman v. Cars Prot. Plus*, No. 267473, 2007 WL 1491814, at *7 (Mich. Ct.

22  App. May 22, 2007) ("The MCPA authorizes an action to enjoin in accordance with the

23  principles of equity a person who is engaging in or is about to engage in a method, act, or

24  practice which is unlawful under the MCPA.") Pandora's argument ignores the fact that

25  Plaintiff's MCPA claim does not seek monetary relief, but instead, seeks injunctive relief to stop

26  Pandora from unlawfully disclosing its users' Protected Information. (¶ 55.) As a result,

27  Pandora's damages argument fails.

28

**C.   Deacon sufficiently pleads that a reasonable person would have relied on Pandora's representations that it would only share his name and other private information with other Pandora users who knew his email address and requested to view his station.**

Pandora's final argument is that an "MCPA claim may only be maintained on behalf of an individual or individuals who relied on Pandora's privacy representations at the time they signed up for the service." (Def. Mot. 19:8-9.) Pandora argues that the MCPA claim should therefore be dismissed because Deacon supposedly fails to allege that he relied on Pandora's Privacy Policy when he signed up for Pandora's service. Pandora's invented theory is untenable.

The MCPA does not require class members to allege "reliance on the alleged misrepresentations." *Hoang v. Reunion.com, Inc*., No. C-08-3518 MMC, 2010 WL 1340535, at *5 (N.D. Cal. Mar. 31, 2010) (citing *Dix v. Am. Bankers Life Assurance Co*., 415 N.W.2d 206, 209 (Mich. 1987)); *See Bobbitt v. Acad. of Court Reporting, Inc*., 252 F.R.D. 327, 341 (E.D. Mich. 2008) (finding that plaintiff need not allege reliance to sufficiently state a claim under the MCPA). Rather, a plaintiff need only establish that "a reasonable person would have relied on the representations." *Bobbitt*, 252 F.R.D. at 341. This is because the MCPA "was enacted to provide an enlarged remedy for consumers who are mulcted by deceptive business practices," and "should be construed liberally to broaden the consumers' remedy, especially in situations involving consumer frauds affecting a large number of persons." *Peters v. Cars to Go, Inc*., No. 1:97-CV-920, 1999 WL 33502378, at *2 (W.D. Mich. Mar. 17, 1999) (quoting *Dix*, 415 N.W.2d at 209). Thus, Pandora is incorrect that reliance on the Privacy Policy is required to state a claim under the MCPA.

Even if reliance was required, Deacon still sufficiently pleads his MCPA claim by alleging that he reasonably believed that his Protected Information would only be available to other registered Pandora users who knew his e-mail address and sought out his Pandora stations—as stated in Pandora's Privacy Policy—and that, by necessary implication, such information would not be disclosed to the public at large or his Facebook contacts. (¶ 54.)

Pandora counters that its Facebook integration and attendant disclosure of Deacon's music-listening history cannot form the basis of an MCPA claim because it occurred "*after* the

members of the proposed class signed up for Pandora's services." (Def. Mot. 19:10-11.) (emphasis added.) This defies logic. Deacon relied on the Privacy Policy in effect when he signed up—which contained no mention of Pandora's intent to share his information over the course of their relationship. Pandora's citation to *Zine v. Chrysler Corp.*, 600 N.W.2d 384 (Mich. Ct. App. 1999), a case that dealt with sale of a car, is thus unavailing. The *Zine* Court found that, in the context of the transaction (i.e., the sale of the vehicle), the duty to disclose material facts extinguishes after the transaction is complete. *Id.* at 398. Deacon's subscription and use of Pandora's music service, however, is ongoing—there is no single transaction like the sale in *Zine* that would extinguish Pandora's duty to disclose. Accordingly, even if Pandora's argument had merit (it does not), Deacon still sufficiently pleads his MCPA claim.

In the end, none of Pandora's attacks against Deacon's MCPA claim warrant dismissal. As a consequence, this Court should deny the Motion to Dismiss.

## CONCLUSION

Pandora disclosed Deacon's full name and music-listening history to his Facebook contacts and others on the Internet—plainly violating the Michigan VRPA and its own Privacy Policy in the process. None of Pandora's various arguments weigh in favor of dismissal. Accordingly, Deacon respectfully asks that this Court deny Pandora's Motion to Dismiss in its entirety and allow the case to proceed to discovery.[9]

---

[9]    In the event this Court disagrees, Deacon respectfully requests leave to add further detail, additional claims, or otherwise take steps necessary to cure any defects found by this Court. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986); *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (leave to amend should be granted even if the plaintiff did not request leave, unless it is clear that the complaint cannot be cured).

1    Date: December 30, 2011                    Respectfully submitted,

2                                               PETER DEACON, INDIVIDUALLY AND ON

3                                               BEHALF OF ALL OTHERS SIMILARLY SITUATED

4                                               By: /s/ Ryan D. Andrews

5                                                    One of his attorneys

6

7    SEAN REIS, Esq. (sreis@edelson.com) - SBN 184044

     EDELSON McGUIRE, LLP

8    30021 Tomas Street, Suite 300

     Rancho Santa Margarita, California 92688

9    Tel: (949) 459-2124

     Fax: (949) 459-2123

10

11   JAY EDELSON, Esq. (*Pro Hac Vice*)

     (jedelson@edelson.com)

12   RYAN D. ANDREWS, Esq. (*Pro Hac Vice*)

     (randrews@edelson.com)

13   ARI J. SCHARG, Esq. (*Pro Hac Vice*)

     (ascharg@edelson.com)

14   EDELSON McGUIRE, LLC

15   350 North LaSalle Street, Suite 1300

     Chicago, Illinois 60654

16   Tel: (312) 589-6370

     Fax: (312) 589-6378

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Ryan D. Andrews, an attorney, hereby certify that on December 30, 2011, I served the above and foregoing **_Plaintiff's Response in Opposition to Defendant's Motion to Dismiss_** by causing true and accurate copies of such paper to be transmitted to all counsel of record via the Court's CM/ECF filing system on this, the 30th day of December, 2011.

/s/ Ryan D. Andrews

---

Plaintiff's Response in Opposition
To Defendant's Motion to Dismiss

Case No. 4:11-CV-4674-SBA